McGEE v ERIKSEN

1. BOUNDARIES—ESTABLISHMENT—ACQUIESCENCE.

The doctrine of acquiescence in a boundary line between adjacent parcels of real estate is applicable only when a line arrived at is the product of a bona fide controversy followed by agreement and acquiescence which need not continue for the limitations period, or where a boundary is acquiesced in for the statutory period, or where it arises out of the intent of a common grantor to effect the practical location of a boundary line.

2. ADVERSE POSSESSION—ACQUIESCENCE—ESTOPPEL—LACHES.

The doctrines of adverse possession and acquiescence are based essentially upon much the same policies as the doctrines of estoppel and laches with the import of each theory being against a party who has had rights that have not been asserted for an extended period of time to the detriment of another.

3. SEARCHES AND SEIZURES—BOUNDARIES—SURVEYORS—CONSTITUTIONAL LAW.

The provisions of the Michigan Constitution relative to searches and seizures do not have any application to the acts of a surveyor who in the normal course of business undertakes to locate boundary lines pursuant to directions of the person who secures his services (Const 1963, art 1, § 11).

Appeal from Livingston, Paul R. Mahinske, J. Submitted Division 2 December 6, 1973, at Detroit. (Docket No. 14617.) Decided March 1, 1974.

Complaint by James E. McGee and others against Edward P. Eriksen and others for trespass. Judgment for defendants. Plaintiffs appeal. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES
[1] 12 Am Jur 2d, Boundaries §§ 85, 86.
[2] 12 Am Jur 2d, Boundaries § 89.
[3] 12 Am Jur 2d, Boundaries §§ 106–109, 116.

*Renne & Welter* and *Paul G. Valentino, J. D., P. C.,* for plaintiffs.

*Michael F. Merritt,* for defendants.

Before: DANHOF, P. J. and BRONSON and O'HARA,* JJ.

O'HARA, J. This appeal arises from a boundary dispute. The plaintiffs and defendants share a north-south boundary with the plaintiffs owning the northernmost property. They brought an action for trespass alleging *inter alia* that agents of the defendants had cut a fence recognized as the common boundary line between the property of the respective parties in order to enter on the land of plaintiffs and to fell certain trees. It was further alleged that this action was deliberate and intentional. Plaintiffs, accordingly, sought treble damages pursuant to MCLA 600.2919; MSA 27A.2919. The cause was tried to the court. From a judgment vesting title to the questioned land in defendants and dismissing the complaint with prejudice, plaintiffs appeal of right.

The testimony adduced at trial tended to establish the following facts: plaintiffs and defendants are adjoining landowners in Cheboygan County. The involved property is covered by dense woods and is primarily suitable for hunting purposes. On the southern boundary of the lands owned by plaintiffs they share a common boundary with the northern perimeter of property held by the defendants. That common boundary is approximately one mile in length. The precise subject matter of this

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

dispute is a strip of land north of a so-called fence line around which much of this litigation revolves. The sum total of land in dispute apparently is some 18 to 22 acres.

Plaintiff McGee acquired title to his land by warranty deed in July, 1951. Plaintiff Wildwood obtained its property in the spring of 1961. Plaintiff Rancho Paleto purchased its holdings in November of 1965. Defendants Eriksen and Fisher, jointly, purchased their land in 1951.

There was no suggestion of controversy until early in 1966 when agents of defendants Eriksen and Fisher crossed a wire fence running in the general vicinity of the boundary line. They removed a swath of trees to build a road. Prior to such activities the defendants had a survey taken which purportedly revealed the true boundary to be about 100 feet north of the fence. The trees were cut from the area between the fence and the line indicated by the survey.

It was asserted by plaintiffs that the defendants trespassed upon their lands and caused substantial damages to plaintiffs' individual properties by severing numerous trees growing thereon. Their claim of ownership to the disputed lands was premised on the establishment of a boundary line by means of either acquiescence in the existence of an old line fence along the boundaries between the parties' land or, alternatively, that they acquired all the involved lands by means of adverse possession. Per contra it was claimed by defendants that no trespass was committed since the lands in question belonged to them. Defendants' assertion of title was based upon (1) the description contained in the deeds along with the alleged existence of a valid, clear chain of title and (2) the contention that by reason of a recent survey the

land was shown to lie within the boundaries described in pertinent deeds.

There was a serious dispute about the nature and origin of the wire which allegedly delimited the boundary line. It was variously described as a single strand and a woven wire. There was testimony that the wire was of ancient origin and some to indicate more recent placement. Parts of the wire were imbedded in nearby trees in varying depths and some old wire was lying on the ground. Other wire was in scraps entirely unattached to other wire or any tree or post.

Plaintiff McGee testified to having seen a fence about the time he purchased his property some 25 years ago. Some ambiguity exists with regard to dates since McGee only took title to his land in 1951. But he apparently lived on the land several years prior to this time since he purchased the property under land contract. Additionally, although the trial in the instant case was held in early 1970, the fence controversy which triggered the lawsuit occurred in 1966. As far as McGee knew he believed the fence to be the boundary. There had been, to his knowledge, no prior dispute over the true boundary. He related that on occasion he had been chased by defendants or their agents from their side of the wire fence back across to what he regarded as his own holdings.

Testimony by officers of the other party-plaintiffs indicates that they had purchased their land in the 1960's and that they had relied on the wire fence in existence at that time as reflecting the true property line.

On behalf of plaintiffs two long-time residents of this area testified with respect to their knowledge of where the boundaries were located. Both wit-

nesses professed considerable familiarity with the involved land and testified to the existence of certain fences running in an east-west and north-south direction. This testimony would indicate that various fences were apparently constructed by persons known and unidentified at different points in time. They could not testify as to personal knowledge of whether landowners prior to the party litigants herein had treated the fences as demarcating the boundary lines. At no time had they heard predecessors in title claim the fence lines as being determinative of the boundaries. They also related that where wire was affixed to trees the fence line wove in and out as it followed the random location of trees. No one was overly concerned about the exact location of their property's outermost limits. Nor did everyone regard the fence as being absolutely determinative of where one person's holdings began and another's ended.

Defendants' predecessor in title testified that about the time he purchased this property he observed no fences or wire to the north of sections 34 and 35 when he traversed the property on foot. There was, he related, a woven wire fence going north and south on a portion of section 34. He bought the property based upon the description in the deed and not the existence of any observable physical boundaries. Further testimony was to the effect that he had given his brother permission to string a wire in both an east-west and north-south direction along the supposed boundary lines. This was sometime before 1948 and intended solely to keep hunters out. The witness did not know or care where the true boundary was. When he sold the property to defendants he told them that he didn't know the significance of any of the wires or fences and that they could not be regarded as

accurate. The suggestion was made that defendants have the land surveyed.

The testimony of defendants was to the effect they had spoken to their immediate grantor as they walked around the property and that he had informed them not to rely on any fences as establishing boundaries. As they traversed the area they observed bits and pieces of wire in various places but defendants attributed no significance to the wire which primarily consisted of short pieces lying on the ground or attached to trees. It bore no resemblance to a fence line. As heretofore noted, their grantor indicated the desirability of having the property lines authoritatively established by resort to a survey.

In the fall of that year (1966) defendants strung a single strand wire fence from tree to tree on the northernmost boundary of the property. They later completed the fence. The fence was located in a random manner which followed a zigzag pattern from tree to tree. There was no fence line to follow and the new wire might vary anywhere from a foot or two up to 100 to 200 feet from where the old wire was located. It was the claim of defendants that the wire was aimed at trespassing hunters and in no manner was intended to establish a northern line. They did acknowledge posting the property against hunters and other trespassers. This allegedly was in response to repeated incursions on their property from adjacent lands. They further admitted chasing hunters back across the barrier.

There are two other matters which took place below and which are of sufficient substance to note. The first of these relates to the fact that the only expert testimony as to the proper location of the boundary was provided by the surveyor whom

defendants retained prior to cutting the trees in the controverted strip. As far as he knew no other survey had been made since the original government survey of around 1850. The court undertook its own interrogation of this witness and made a detailed examination of the surveyor. Second, on more than one occasion the trial judge with permission of the parties visited the property in question and particularly sought to locate the woven wire fences and single strand wires about which there was considerable testimony.

The trial judge's findings of fact as they appear in his opinion can be summarized as follows. There always was a doubt as to the true line which was never resolved. There was no controversy before the one initiating this litigation. There was no oral agreement with respect to a line between prior owners which was established or demarcated by monuments and maintained as a boundary in fact. Whatever fences had been previously constructed by prior landowners and the single strand placed around the perimeter of the property by defendants were not erected with the purpose of defining the true property line. The proofs simply established a situation where different persons had purchased property in a sparsely settled area and had randomly erected fences without any real concern as to the outer limits thereof. There was no acquiescence in law or fact. To the extent that there was a misunderstanding about the nature of the fence it was a unilateral mistake by plaintiffs. Nor did the trial judge find any merit in plaintiffs' alternative theory that they had acquired possession to the disputed strip by virtue of adverse possession for the statutory period.

On appeal plaintiffs argue that the trial court erred in finding that they failed to establish title

to the premises by either of the aforementioned theories.

The elements of adverse possession have been stated so often that no real assistance to the bench and bar would be rendered by reiterating them here. For example see *Ennis v Stanley,* 346 Mich 296, 301; 78 NW2d 114, 116–117 (1956), and authority cited therein.

While plaintiffs relied in part on the theory of adverse possession as a basis for recovery and also argue the point on appeal, neither the pleadings nor the pretrial summary make that claim. Mayhaps the reason for this is that the fence constructed by defendants had not existed for 15 years at the time of the alleged trespass. Similarly, plaintiffs Rancho Paleto and Wildwood were owners of the northern land considerably less than the statutory period. Defendants owned their property somewhat less than 15 years too. Only plaintiff McGee could have owned his land for as long as the prescriptive period. As to both him and the other plaintiffs we cannot say that the finding of the trial judge that plaintiffs did not establish adverse possession was clearly erroneous.

This Court recently had occasion to discuss the doctrine of acquiescence in some detail. We noted the existence of three branches of what is commonly referred to as the theory of acquiescence. See *Rock v Derrick,* 51 Mich App 704; 216 NW2d 496 (1974). Hence, we see little benefit arising from a protracted discussion relative to the acquiescence doctrine.

It is almost axiomatic that the doctrine of acquiescence is applicable only when a line arrived at is the product of a bona fide controversy followed by agreement and acquiescence which need not continue for the limitations period, or where a bound-

ary is acquiesced in for the statutory period. See *De Hollander v Holwerda Greenhouses,* 45 Mich App 564; 207 NW2d 187 (1973); *Moore v Ottawa Equipment Co,* 26 Mich App 89; 181 NW2d 780 (1970); *Maes v Olmsted,* 247 Mich 180; 225 NW 583 (1929). A third species of the acquiescence doctrine arises out of the intent of a common grantor to effect the practical location of a boundary line. See *Maes v Olmsted, supra,* and *Daley v Gruber,* 361 Mich 358; 104 NW2d 807 (1960).

On this record, we also cannot say that the trial judge's finding against plaintiffs' claim of title by acquiescence was clearly erroneous as courts historically have applied that standard of review.

The next argument of plaintiffs-appellants pertains to a claim that even if acquiescence or adverse possession are not established the trial court still should have applied the doctrines of estoppel or laches to preclude defendants from asserting their ownership of the disputed land. It is asserted that the same acts which plaintiffs claim operate to invoke adverse possession or acquiescence also support the allegations of laches or estoppel.

In any real sense the doctrines of adverse possession and acquiescence are based upon much the same policies as the doctrines of estoppel and laches. The import of each theory is against a party who has had rights that have not been asserted for an extended period of time to the detriment of another. We perceive no basis for the application of either the doctrines of laches or estoppel to the instant case.

The next allegation by plaintiffs is that entry of the surveyor on the lands in question for the limited purpose of making observations incident to the survey was violative of art 1, § 11 of the 1963 Constitution. This novel argument postulates that

since the surveyor did not have permission of the plaintiffs to enter the land the rights of plaintiffs to be secure in their possessions was invaded and the proper remedy was exclusion of testimony based on that unlawful behavior.

We are not persuaded that the provisions of art 1, § 11 relative to searches and seizures have any application to the acts of a surveyor who in the normal course of business undertakes to locate boundary lines pursuant to directions of the person who secured his services.

The several other assignments of error by plaintiffs are not of sufficient importance to the jurisprudence of this state to merit detailed discussion.

For the reasons stated herein, we affirm the judgment of the lower court with costs to the defendants.

All concurred.