PYNE v ELLIOTT

1. EQUITY—APPEAL AND ERROR—FINDINGS OF FACTS.

The Court of Appeals reviews equity cases *de novo* but will not disturb the trial court's findings unless convinced that a different result would have been reached had the Court occupied the trial court's position.

2. BOUNDARIES—ACQUIESCENCE—STATUTE OF LIMITATIONS.

A boundary line which has been treated and acquiesced in by the parties as the true line between adjacent properties for longer than the 15-year statutory period becomes the true line as a matter of fact and as a matter of law and will not be disturbed.

3. BOUNDARIES—AGREEMENT AND ACQUIESCENCE—STATUTE OF LIMITATIONS.

A boundary line established by mutual agreement and thereafter acquiesced in will be considered the true line even though the period of acquiescence may fall short of the time required for gaining title by adverse possession.

4. BOUNDARIES—ACQUIESCENCE—INTENT OF PARTIES.

A boundary line which has been established, even though erroneously, for so long that a landowner's predecessors in interest intended to deed the property from that line, will not be disturbed.

5. BOUNDARIES—ACQUIESCENCE.

A trial court correctly located a disputed boundary line at the position in which the parties to the dispute had acquiesced where there were several theories of acquiescence upon which it could have based such a determination.

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 822.
  27 Am Jur 2d, Equity § 10.
[2-5, 8] 12 Am Jur 2d, Boundaries §§ 85, 86, 116.
[6, 7] 12 Am Jur 2d, Boundaries § 89.
[9] 12 Am Jur 2d, Boundaries § 92.

6. DEEDS—INTENT OF PARTIES—ESTOPPEL BY DEED—BOUNDARIES.

It is a general rule that in interpreting deeds the primary object is to determine the intention of the parties from the instrument itself; therefore, the principle of estoppel by deed should be applied to prevent a defendant in a boundary dispute from contradicting the clear language of his own deed by which he conveyed property to plaintiff's predecessor in interest.

7. BOUNDARIES—LACHES—ESTOPPEL.

Defendants in a boundary line dispute should be barred from asserting any claim to the disputed property where they were aware of a surveying error and allowed the condition to continue by doing nothing to protect innocent future purchasers; the defendants should be allowed to achieve no advantage under the general principle of equitable estoppel and because they did nothing to assert any claim to the disputed land for longer than the 15-year limitation fixed by law, laches can be applied.

8. BOUNDARIES—ACQUIESCENCE—AGREEMENT OF PARTIES.

A boundary was not established by acquiescence where one of the adjoining landowners did not enter into an agreement establishing the line.

9. BOUNDARIES—EQUITY—DIVISION OF PROPERTY—DEEDS—LACHES.

A trial court erred by dividing a parcel of land between the parties to a boundary line dispute, where the defendants had effectively deeded away their interest in the land, and subsequently delayed taking any action after becoming aware of a mistake in the survey of the land.

Appeal from Alcona, Philip J. Glennie, J. Submitted Division 2 April 9, 1974, at Lansing. (Docket No. 16047.) Decided May 29, 1974.

Complaint by Roy and Helen Pyne and Ellis and Wanda Weitzel against Roy and Leslie Elliott for determination of a boundary line. Judgment rendered fixing boundary line between properties and dividing a disputed parcel of land between parties. Plaintiffs appeal. Reversed in part and remanded.

*Gillard & Gillard,* for plaintiffs.

*Boyce, Yahne & Wenzel,* for defendants.

Before: McGREGOR, P. J., and R. B. BURNS and O'HARA,* JJ.

McGREGOR, P. J. This is a dispute over the ownership of 240 feet of lakefront land, triangular in shape, which arose as a result of a surveyor's error. Following a trial before the court without a jury, a written opinion and judgment dividing the disputed property between the parties was entered by the trial court.

Defendants Elliott were originally the sole owners of the land in question, "Government Lot 4". There is some disagreement as to the exact date on which the Elliotts obtained title because of imperfections in the title; the trial court set the date at March 10, 1937. The relevant transactions commenced with the Elliotts' ownership of the land.

On August 31, 1945, the Elliotts conveyed the south half of Government Lot 4 to E. G. Tackaberry and his wife, by a deed which reads:

"South half of Government Lot 4, Section 36, Township 28 North, Range 9 East, containing 30-69/100 acres more or less, according to Government survey thereof."

Both the Elliotts and the Tackaberrys desired to subdivide their respective properties. Both employed the Scott Engineering Company to survey the property and to draft plats. As would subsequently become apparent, the Scott Engineering Company was inaccurate in that it located the east-west boundaries of the various land parcels approximately 240 feet north of their actual posi-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

tions, but located the rear corner of the disputed parcel correctly.

The Elliotts executed a plat for the Alcona Sandy Shores Subdivision on September 14, 1946, which was recorded on April 11, 1947. Similarly, part of the south half of Government Lot 4 was platted by Vera Tackaberry as Edenwood Subdivision, on November 29, 1948, and recorded on January 19, 1949. The south boundary of the Alcona Sandy Shores Subdivision was the north boundary of the Edenwood Subdivision; both subdivisions were affected by the serveying error. Both subdivisions encompassed the eastern part of Lot 4 adjoining Lake Huron.

The Elliotts began to sell the various lots in their subdivision, culminating in the sale of the remaining lots and the remainder of the north half of Government Lot 4, which was not subdivided, to George O. Monnier and his wife, in June, 1949. It appears that the Elliotts intended to divest themselves of their entire interest in Government Lot 4. However, since the east part of the north half of the lot had been subdivided and conveyed to the Monniers by lot number, the deed did not specifically refer to the land south of the Alcona Sandy Shores Subdivision, which later surveys found to lie in the north half of the lot. This land, at the time of the sale, was part of the subdivision, due to the original surveying error.

Following the death of Mr. Tackaberry, all of the south half of Government Lot 4 came into the possession of one Helmuth Krave, a single man, through instruments which are not part of the record. By warranty deed, Krave conveyed to Roy W. Pyne and his wife and to William B. Gillard and his wife property described:

"Lots 1 to 25 inclusive of Edenwood, a subdivision

\* \* \* and that part of the south one-half of Government Lot 4, lying west of the said Edenwood Subdivision."

This deed is in the record as plaintiffs' Exhibit No. 16. A subsequent warranty deed effectuated the plaintiffs' agreement to divide the south half of Government Lot 4, the Pynes taking the north half and the Gillards the south half of the lot.

The plat of Edenwood Subdivision was vacated on March 16, 1965. The Pynes sold part of the north half of the south half of Government Lot 4 to Ellis Weitzel and his wife, who are also plaintiffs in this action.

Elliott was aware of the inaccuracy in the survey as early as 1950. At that time, he entered into an agreement with surrounding land owners to equitably settle any future boundary disputes. This agreement was never recorded.

Following vacation of the Edenwood Subdivision, defendant Elliott, by letter dated June 11, 1969, claimed an interest in the south half of Government Lot 4. As a result of this claim, the plaintiffs brought this action to settle the boundary dispute. The trial court found that all parties had acquiesced in the erroneously established boundary line between the north and south parts of Government Lot 4. Since the line had been so established for over 22 years, the court held that it would not be relocated. The court also found that the plaintiffs had acquired no interest in the 240-foot strip of land south of the erroneously drawn southern boundary of the Edenwood Subdivision and north of the properly drawn southern boundary of Government Lot 4. Although it found that the Elliotts had failed for 22 years to correct the known error, the trial court determined that it would divide the contested property between the parties. Therefore,

it ordered that 120 feet of the disputed property be conveyed to the Elliotts. Additional facts will be presented as required.

The sole issue before us is whether the trial court erred by dividing the contested parcel of land between the parties in order to settle a boundary line dispute, when the defendant Elliott had known for over 20 years that the boundary line was incorrectly drawn due to a surveyor's error but did nothing to correct the record and to protect subsequent purchasers, such as the plaintiffs.

This Court reviews equity cases *de novo* but will not disturb the trial court's findings unless convinced that we would have reached a different result had we occupied that court's position. *In re Hartman Estate,* 51 Mich App 192; 215 NW2d 202 (1974). It is within the confines of this long-standing rule that we turn to a discussion of the lower court's opinion and judgment.

At trial, defendants' Exhibit 5 was referred to in order to establish the various boundary lines under discussion. A copy of that exhibit, a surveyor's map of the general area, is included as an appendix to this opinion and will be referred to throughout our discussion.

The trial court found that the north boundary line of the property in question had been established at line 1 of the surveyor's map. Applying certain "equitable considerations", the trial court set the south boundary line at halfway between lines 3 and 4.

The parties are not in serious disagreement so far as the north line is concerned. Plaintiffs accept line 1 as the northern boundary, but argue that line 4 should be established as the southern boundary. Defendants seem to argue that the northern

boundary line was properly set by the lower court, but then state:

"Defendants cannot possibly be hurt by any ruling which is consistent."

In other words, the defendants will accept line 1 as the northern boundary, if line 3 is held to be the sourthern boundary line.

The defendants state that the plaintiffs "have never come up with a theory or rationale as to why they should be allowed to claim that the north line of Edenwood should hold while the south line should not hold". Such a theory or rationale is in fact manifest throughout plaintiffs' brief and is so elementary as to require no formal statement. Defendant Elliott caused the situation which developed, he did nothing about it, and he should now suffer any loss. Contrary to defendants' assertion, the north line of Edenwood should be set as the plaintiffs' northern boundary and the additional 240 feet of lake frontage should go to them. The plaintiffs should have the entire benefit of defendants' error and none of the loss. It was the defendants' inaction which occasioned this situation. The plaintiffs have done nothing which should cause them to be deprived of their property. The inevitability of this conclusion can be seen clearly if the establishment of each boundary line is considered separately so as to avoid the confusion apparent in the lower court's opinion.

As noted above, there was no serious disagreement concerning the northern boundary line of plaintiffs' property. The northern boundary was erroneously established at line 1 by the survey in 1946. The trial court found that this boundary line "has been recognized and observed as the dividing

line of the plats by all parties since 1950". Therefore, concluded the trial court:

"The line is established and may not be relocated even though said line has been proven in error by subsequent surveys."

The lower court reached this conclusion based on its findings that "the line established between the two subdivisions has been acquiesced in for a period of approximately 22 years". The lower court may have had in mind one of three "acquiescence theories", any of which would be applicable in the present case, to sustain the lower court's holding as to the north line:

I. *Acquiescence for Statutory Period.* All parties occupied and developed their land up to line 1, since that line was incorrectly drawn by Scott Engineering, in 1946. Therefore, all parties have acquiesced in the establishment of line 1 as the boundary line between the north and south halves of Government Lot 4, for more than the statutory 15-year period, and that boundary line will not now be disturbed.

"It has been repeatedly held by this court that a boundary line long treated and acquiesced in as the true line, ought not to be disturbed on new surveys. Fifteen years' recognition and acquiescence are ample for this purpose." *Johnson v Squires,* 344 Mich 687, 692; 75 NW2d 45 (1956), quoting from *Dupont v Starring,* 42 Mich 492, 494; 4 NW 190 (1880).

"The original survey may have been inaccurate, its lines may not correctly and accurately fix the boundary, but if they have been acquiesced in for a sufficient length of time they fix the 'true line' as matter of fact and as matter of law." *Hanlon v TenHove,* 235 Mich 227, 233; 209 NW 169 (1926).

"The doctrine of acquiescence was properly applied by the trial court, it being shown by ample evidence

that the boundary as fixed by the trial court had been acquiesced in for a period of 15 years, and much more." *Jackson v Deemar,* 373 Mich 22, 26; 127 NW2d 856 (1964).

Also see *Cullen v Ksiaszkiewicz,* 154 Mich 627, 629; 118 NW 496 (1908); *Walters v Union National Bank of Marquette,* 314 Mich 699; 23 NW2d 184 (1946).

II. *Acquiescence Following a Dispute and Agreement.* All parties recognized that a surveying error had occurred, and many of them, including the defendants and plaintiffs' predecessor in title, entered into the agreement establishing the north boundary line. This agreement, however, was never recorded, but rather, was kept in the defendants' safe deposit box.

" 'It has been frequently held in this state that where parties by mutual agreement, and for that express purpose, meet and fix a boundary line, and thereafter acquiesce in the line so established between them, such line will be considered the true line between them, notwithstanding the period of such acquiescence falls short of the time fixed by the statute of limitations for gaining title by adverse possession.' " *Cochran v Milligan,* 359 Mich 148, 151; 101 NW2d 292 (1960), quoting *Jones v Pashby,* 67 Mich 459; 35 NW 152 (1887). Accord: *Escher v Bender,* 338 Mich 1, 6; 61 NW2d 143 (1953); *Ennis v Stanley,* 346 Mich 296, 306; 78 NW2d 114 (1956); *Rickheim v Boden,* 369 Mich 150, 154; 119 NW2d 620 (1963).

III. *Acquiescence Arising from Intention to Deed to a Marked Boundary.* The northern boundary had been erroneously established at line 1 for so many years that the plaintiffs' predecessors in interest intended to deed from that line.

"It must be presumed that description in later conveyances by one of these parties, necessarily involving

such boundary, are intended to refer to the boundary so located on the ground and not to some other imaginary line or point which might have been taken in the absence of such location. Lapse of time is not involved in the situation, nor a compromise line after dispute, but, rather, an identification of intended location by those who are to be affected." *Daley v Gruber,* 361 Mich 358, 363; 104 NW2d 807 (1960); also see *Maes v Olmsted,* 247 Mich 180; 225 NW 583 (1929); *Newell v Jeffries,* 6 Mich App 279, 281; 148 NW2d 886 (1967).

Based on any of these theories, the trial court correctly located the north boundary line of the property in dispute. This determination will not be disturbed. The determination relative to the south boundary line, however, is not as well supported by the facts or the law.

The lower court found that the plaintiffs had "acquired ownership of only that land formerly known as Edenwood subdivision". This finding is clearly erroneous. The deed from Krave to the plaintiffs, dated November 9, 1964, and included in the record as plaintiffs' Exhibit 16, includes this description:

"Lots 1 to 25 inclusive of Edenwood * * * and that part of the south one-half of Government Lot 4, lying west of the said Edenwood Subdivision."

Since no question as to the accuracy or the authenticity of this deed was raised at trial, by its terms plaintiffs have acquired all of the land in the south half of Government Section 4 west of the Edenwood Subdivision as well as the subdivision itself. By the clear wording of this deed, the plaintiffs are the owners of all the land up to line 4, at least up to the west boundary of Edenwood Subdivision. The only property of which the ownership can possibly be contested is that parcel between

line 3 and 4, lying east of the west boundary of Edenwood. The southern boundary of plaintiffs' property should be established at line 4, along the entire length of the government lot. This conclusion is based upon a number of considerations which will be discussed separately.

Defendants Elliott have no claim to any part of the south half of Government Lot 4. The Elliotts deeded the "south half of Government Lot 4" to the Tackaberrys, in 1945. The deed is included in the record as an exhibit and an examination of it discloses no exceptions. This deed was executed before the surveying error was made and cannot possibly be affected by it. Since the Elliotts have deeded away their entire interest in the south half of Government Lot 4, it seems incredible that they should now claim any interest in that part of the lot whatsoever. It appears that they assert an interest only because the Tackaberrys have not seen fit to do so.

The deed is not ambiguous; it was clearly the intention of the parties to convey the entire south half of Government Lot 4.

" 'It is a general rule that in interpreting deeds and other written instruments, the primary object is to determine the intention of the parties from the instrument itself.' " *Thomas v Jewell,* 300 Mich 556, 558; 2 NW2d 501 (1942), quoted in *Bice v Holmes,* 309 Mich 110, 116; 14 NW2d 800 (1944).

"The rule [is] that the intention of the parties as determined from a consideration of the entire instrument should control * * * ." *Curran v Maple Island Resort Association,* 308 Mich 672, 680; 14 NW2d 655 (1944); also see *Weisenburger v Kirkwood,* 7 Mich App 283, 290; 151 NW2d 889 (1967); *Farabaugh v Rhode,* 305 Mich 234; 9 NW2d 562 (1943).

The principle of estoppel by deed should be

applied to prevent defendants Elliott from contradicting the clear language of their *own* deed.

"Where parties claiming under the same grantor recognize a boundary between them, and one of them afterwards conveys with reference to that boundary and without encroaching upon any rights existing in third parties, he and those who claim under him are bound by the description as against his grantee, and a change of the recognized boundary by a resurvey will not affect the grantee's rights." (Syllabus) *Fahey v Marsh,* 40 Mich 236 (1879).

If the Elliotts had any right to any part of the south one-half of Government Lot 4, they slept on their rights and cannot equitably be allowed to enforce them now. The defendant Elliott himself concedes that he knew about the surveying error in 1950. This admission is confirmed by the testimony of a disinterested witness. The defendants also make this concession in their brief and it was so found by the trial court.

Although aware of the surveying error, the defendants did absolutely nothing to protect innocent future purchasers, such as the plaintiffs in this case. Having allowed this condition to arise and to continue, the defendants Elliott should be barred from asserting any claim to the disputed property. *McGee v Eriksen,* 51 Mich App 551; 215 NW2d 571 (1974).

Under the general principle of equitable estoppel, the defendants should be allowed to achieve no advantage. The defendants knew that the Tackaberrys were buying this land for commercial development, since it was surveyed for all the land owners under a joint agreement when they had the land platted. The defendants did nothing to correct the erroneous boundary lines and should be estopped from establishing any different bound-

ary lines now. *Cleveland-Cliffs Iron Company v Gauthier,* 143 Mich 296, 298, 299; 106 NW 862 (1906). Also see *Snider v Schaffer,* 276 Mich 92, 100; 267 NW 791 (1936), and *Burrell v Brugger,* 1 Mich App 486, 488; 136 NW2d 730 (1965).

The defendants knew about the erroneous surveys from at least 1950; they did nothing to correct the error or to assert any claim to the disputed land until July 11, 1969. This is longer than the 15-year limitation fixed by law, and laches can be applied. *Lowry v Lyle,* 226 Mich 676, 684; 198 NW 245 (1924).

The defendants have suffered no loss and cannot possibly be injured by an award of the entire disputed property to the plaintiffs. The defendants allege that they have quit-claimed their interest in valuable lake frontage in an effort to make an equitable adjustment of the property lines in this section. The trial court also found that the defendants had conveyed land to Erickson in order to avoid difficulty in the various lot lines and to compensate for any errors caused by the engineering survey. However, as noted in the lower court's opinion, this deed was one of two given to adjust the boundary disputes between the defendants and Erickson. These two deeds are included in the record; they establish that the parties merely exchanged property, and that the Elliotts, in fact, gave up nothing for which they were not compensated. In addition, it should be noted that Erickson is not a party to this action; any benefit conferred upon Elliott should not be charged against the plaintiffs here.

Defendants also argue that "if the lines of the plat are to hold, both the north line and the south line should hold, and not just one of those lines." This contention cannot be accepted. Consistency

should not be preserved at the expense of justice. The defendants allowed the north boundary line to become fixed due to acquiescence; they conveyed away their interest in the south half, and, therefore, they had nothing to do with the southern boundary.

The south boundary line was not established in the same manner as was the north line. The land south of the south boundary, line 4, was owned by one Springer, who refused to sign the agreement entered into by most of the other landowners in the area. Therefore, the southern boundary was not established by acquiescence following a dispute settled by agreement. The land between lines 3 and 4 was not developed by any of the parties, including Springer. Therefore, neither of these lines were established as a southern boundary by acquiescence for the statutory period. Springer never exercised any control over the property north of line 4 and the Tackaberrys never exercised any dominion or control over the property south of line 3.

The trial court found that:

"[Plaintiffs] had actual knowledge that the Tackaberrys had accepted the south line of Edenwood as being the south line of Government Lot 4 as late as September 4, 1965, when it was agreed that the seller shall accurately and properly establish the south government lot line so that the same shall be visible, open, notorious, and descriptive."

This finding is erroneous. An examination of the contract executed on September 4, 1965, between plaintiffs Pyne and plaintiffs Weitzel indicates that only the north half of the south half of Government Lot 4 was involved. Since this contract dealt with only the *north* half of the south half of

Government Lot 4, it is not clear how it can affect the *south* half of the south half of that lot. In any event, the Gillards, who own the south half of the south half, and whose property was taken and given to defendants, were not parties to this contract and should not be affected by it.

The trial court based its decision on "equitable considerations". While equitable considerations may be relevant, it is manifest from the record that any such considerations should operate in favor of the plaintiffs. The trial court concluded that plaintiffs had not acquired title to the entire parcel of land comprising the south half of Government Lot 4. The court also erred by dividing the disputed strip of land between the parties, when the defendants had absolutely no claim to it. The lower court apparently failed to appreciate the effect of the defendants' deed to the Tackaberrys, and the effect of the defendants' long delay in taking any action after having become aware of the facts.

Judgment of the lower court is reversed, insofar as it divides the disputed property equally between the parties, and remand for entry of a judgment consistent with this opinion. Costs to plaintiffs.

All concurred.