Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/12/2024 09:09 AM CDT

Susan Dzingle, appellant, v.
Thomas Krcilek, appellee.

___ N.W.3d ___

Filed July 12, 2024.    No. S-23-330.

1. **Motions to Dismiss: Pleadings: Appeal and Error.** A district court's grant of a motion to dismiss on the pleadings is reviewed de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.

2. **Equity: Boundaries: Appeal and Error.** An action to ascertain and permanently establish corners and boundaries of land under Neb. Rev. Stat. § 34-301 (Reissue 2016) is an equity action.

3. **Equity: Appeal and Error.** In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Conveyances: Boundaries: Time.** The common grantor rule provides that where conveyances from a common grantor to adjoining landowners describe the premises conveyed by lot numbers, but adjoining owners purchase with reference to a boundary line then marked on the ground, the boundary line, as marked on the ground by the common grantor, is binding upon such adjoining landowners and all persons claiming under them irrespective of the length of time that has elapsed thereafter.

5. **Conveyances: Equity: Intent.** The common grantor rule is an equitable rule designed to ascertain the intention of the parties with respect to the location of premises described by lot number in a conveyance that is executed by a grantor who conveys only part of an area of land owned by the grantor.

6. **Boundaries: Time.** Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey.

7. **Boundaries.** In order for mutual recognition and acquiescence to operate, there must be an assent, by words, conduct, or silence, in a line as the boundary.

8. **Reformation: Fraud.** Reformation may be ordered where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party.

9. **Reformation: Presumptions: Intent: Evidence.** To overcome the presumption that an agreement truly expresses the parties' intent and therefore should be reformed, the party seeking reformation must offer clear, convincing, and satisfactory evidence.

Appeal from the District Court for Valley County, Karin L. Noakes, Judge. Affirmed.

Jared J. Krejci, of Smith, Johnson, Allen, Connick & Hansen, for appellant.

Matthew D. Furrow, of Borders Law Office, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Per Curiam.

## INTRODUCTION

This case concerns a dispute between two siblings over the boundary line between their adjoining tracts of real property. One sibling primarily argues that the boundary should be determined based on an apparent government survey marker found on the land. The other sibling argues that a longstanding fence line should be considered the boundary. The district court for Valley County, Nebraska, ruled in favor of the sibling who relied on the survey marker and rejected the other sibling's fence line arguments. Finding no error in that ruling, we affirm.

## BACKGROUND

Siblings Susan Dzingle and Thomas Krcilek own adjoining tracts of real property in "Section 17, Township 17 North, Range 14, West of the 6th P.M.," in Valley County. Dzingle is the owner of the northwest quarter of Section 17, and Krcilek is the owner of the northeast quarter of Section 17. Most of the facts are not in dispute and were adduced at a trial regarding the true boundary line between the parties' properties. The testimony and evidence most pertinent to the issues raised on appeal are summarized below.

Dzingle and Krcilek's parents owned the relevant properties before them. Their parents began residing on a portion of the property approximately 50 years ago and subsequently acquired other parcels, ultimately resulting in their ownership of three adjoining quarter sections of land, the same being the northeast, northwest, and southwest quarters of Section 17. The southeast quarter of Section 17 belongs to an unrelated owner. A fence that had been in place since at least 1946 ran north and south on the northeast quarter section of the property.

Various witnesses testified that the fence had been in place for as long as they could remember. Krcilek testified that he believed that the fence was the true boundary line between the two quarter sections until 2019, when he and a neighbor discovered what they understood to be a government survey marker on the land. The marker's location indicated that the quarter section boundary line separating the two tracts of land was not where the fence was currently located. Dzingle stated that she was unaware of the survey marker until the present dispute arose.

Shortly after Krcilek discovered the survey marker, the parties' mother died, and Dzingle was appointed as personal representative of her estate. The mother's will did not devise specific property for any of her three children, so the three siblings reached an agreement whereby each would receive one quarter section of the family property. Dzingle, as the

personal representative, subsequently executed deeds in 2020 reflecting that agreement. The deeds conveyed the northeast quarter section to Krcilek, the northwest quarter section to Dzingle, and the southwest quarter section to another brother. The siblings all testified that during the administration of their mother's estate, they agreed that it would be inconvenient and an unnecessary expense for the property to be surveyed before it was divided and distributed, but that if any of them wanted to, he or she could individually pay for a survey.

According to Dzingle, however, she executed the deeds under the assumption that the fence line was the true boundary between the two quarter sections because the fence separated the entirety of Section 17, Township 17 North, Range 14, into east and west halves and was in place throughout her family's ownership of the property. She stated that she assumed that she conveyed to herself all the land in the northwest quarter section of the property west of the fence and that all the land in the northeast quarter section east of the fence was conveyed to Krcilek. She also stated that her intent in executing the deeds was for each sibling to receive a quarter section of equal size, approximately 160 acres each.

Krcilek testified that, during the administration of their mother's estate, he chose not to tell his siblings about the location of the survey marker because the boundary between the quarter sections was not an issue. Krcilek had been managing the entire property and was running his and his siblings' cattle on both sides of the fence without any issue as to where the boundary lines were, so he thought it would be better to bring up the issue later. Krcilek also testified that his siblings "all knew the fences were off" and not the true boundary lines, although he acknowledged that Dzingle probably thought the original fence was the boundary when she executed the deeds to the properties.

In 2021, after Dzingle informed Krcilek that he would no longer be managing her cattle and using her quarter section, Krcilek conducted a survey of his quarter section.

Survey stakes were placed on the land that aligned with the apparent government survey marker previously located. The survey stakes and marker together indicated that the fence ran through Krcilek's quarter section, rather than along the boundary line, and that the true boundary line was approximately 20 feet west of the fence. Krcilek then began constructing a new fence along the survey's boundary line.

## Complaint

Dzingle filed a complaint in the district court under Neb. Rev. Stat. § 34-301 (Reissue 2016) to establish the original fence as the boundary between her and Krcilek's quarter sections. She requested that the court declare the original fence to be the true boundary because the parties had mutually "'recognized and acquiesced'" to it for a period of 10 consecutive years. Alternatively, Dzingle claimed that the court could declare the original fence as the boundary under the "common grantor rule." Dzingle's complaint further requested that the court reform the deeds to reflect the original fence as the true boundary based on mutual mistake or her unilateral mistake.

## Motion to Dismiss Granted

Krcilek responded by moving to dismiss Dzingle's complaint for failure to state a claim upon which relief can be granted. That motion was granted as to Dzingle's claims regarding mutual recognition and acquiescence and the common grantor rule. But the district court ordered Dzingle to amend her complaint to plead her claims of mutual and unilateral mistake with more particularity.

Specifically, as to recognition and acquiescence, the district court explained that the allegations in the complaint failed to show that the parties owned their properties for the requisite 10-year period. The court also explained that recognition and acquiescence as to the parties' grantors could not be proved because the same grantor allegedly conveyed the properties to the parties, precluding the possibility that a boundary

agreement with another grantor was reached. The court further stated that it was persuaded by the majority opinion in a case from Colorado, *Salazar v. Terry*,[1] and quoted language from that opinion to support its conclusion that the mutual recognition and acquiescence rule was inapplicable here.

Similarly, as to the common grantor rule, the district court explained that the rule was inapplicable here because it applies to lots and parcels that do not contain a metes and bounds description and that the properties in this case were conveyed by quarter sections. The court noted that Dzingle did not direct it to any case law supporting an extension of the rule from conveyances of lots to conveyances of quarter sections. The court also disagreed with Dzingle that such an extension made practical sense on the following ground: "Section lines are established and cannot be changed or altered by property owners. Lot and property lines can be changed. There is no boundary ambiguity when deeding property by section."

Dzingle filed her amended complaint, and Krcilek filed an answer and counterclaims. Krcilek's responsive pleading requested, as relevant here, that the district court find his proposed boundary line to be correct, order Dzingle to construct a portion of the new fence on that boundary, eject Dzingle from his property, and declare that certain fixtures on the land belonged to him. The court set these matters for trial.

### District Court Order After Trial

After a bench trial, the district court entered an order reiterating the rulings in its earlier order granting Krcilek's motion to dismiss and further found that Krcilek's proposed boundary based on the survey markers was the true boundary, not the existing fence line. The court also rejected Dzingle's claim for reformation of the deeds based on mutual mistake because Krcilek testified that at the time the parties divided the properties, he knew the original fence was not the true boundary line. As to unilateral mistake, the court rejected that

---

[1] *Salazar v. Terry*, 911 P.2d 1086 (Colo. 1996).

claim because Dzingle failed to prove Krcilek acted inequitably or fraudulently in not disclosing his belief from before the deeds' execution that the fence was not the quarter section boundary line. The court granted Krcilek's counterclaims to eject Dzingle from his quarter section, order her to construct and pay for a part of the new fence on the true boundary line, and declare the fixtures on the land belonged to Krcilek.

Dzingle timely appealed, and we moved the case to our docket.

ASSIGNMENTS OF ERROR

Dzingle assigns, restated, that the district court erred in granting Krcilek's motion to dismiss her mutual recognition and acquiescence and common grantor rule claims, in not granting her a presumption that the fence was the true boundary line, in not reforming her and Krcilek's deeds based on unilateral mistake, and in granting Krcilek's counterclaims.

STANDARD OF REVIEW

[1] A district court's grant of a motion to dismiss on the pleadings is reviewed de novo, accepting the allegations in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party.[2]

[2] An action to ascertain and permanently establish corners and boundaries of land under § 34-301 is an equity action.[3]

[3] In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[4]

---

[2] *Barber v. State*, 316 Neb. 398, 4 N.W.3d 844 (2024).

[3] *Puncochar v. Rudolf*, 315 Neb. 650, 999 N.W.2d 127 (2024).

[4] *Castillo v. Libert Land Holdings 4*, 316 Neb. 287, 4 N.W.3d 377 (2024).

## ANALYSIS

### Common Grantor Rule

[4,5] We begin with the question of whether the common grantor rule applies to the present boundary dispute. The common grantor rule has been addressed by this court on several occasions, including, most recently, in *Huffman v. Peterson*.[5] As stated in *Huffman*, the common grantor rule provides that

> where conveyances from a common grantor to adjoining landowners describe the premises *conveyed by lot numbers*, but adjoining owners purchase with reference to a boundary line then marked on the ground, the boundary line, as marked on the ground by the common grantor, is binding upon such adjoining landowners and all persons claiming under them irrespective of the length of time which has elapsed thereafter.[6]

*Huffman* also explained that the common grantor rule is an equitable rule designed to ascertain the intention of the parties with respect to "the location of premises *described by lot number* in a conveyance which is executed by a grantor who conveys only part of an area of land owned by him."[7]

Dzingle argues that the district court erred in dismissing her common grantor rule claim after determining that the rule only applied to parcels of real estate that are conveyed by lot number, instead of also applying to the properties that are conveyed by quarter section. She seeks a novel holding that the common grantor rule, despite the rule explicitly providing

---

[5] *Huffman v. Peterson*, 272 Neb. 62, 718 N.W.2d 522 (2006).

[6] *Id.* at 65, 718 N.W.2d at 527 (emphasis supplied) (citing *Phillippe v. Horns*, 188 Neb. 304, 196 N.W.2d 382 (1972)). See, also, *McDonald v. Myre*, 262 Neb. 171, 631 N.W.2d 125 (2001) (implicitly accepting same statement of common grantor rule but finding facts of case did not support rule's application); *Lunzmann v. Yost*, 182 Neb. 101, 153 N.W.2d 294 (1967) (same).

[7] *Huffman, supra* note 5, 272 Neb. at 65-66, 718 N.W.2d at 527 (emphasis supplied) (citing *Kraus v. Mueller*, 12 Wis. 2d 430, 107 N.W.2d 467 (1961)).

that it applies to conveyances by lot number, also applies to conveyances of real estate divided into and described as townships, sections, and ranges, per the method of the "Public Land Survey System" (PLSS).[8] Krcilek counters that the definition and purpose of the common grantor rule, as seen in our precedents and the rule's origins, do not support such an expansion. We agree with Krcilek and find no error in the district court's dismissal of Dzingle's claim.

Dzingle has not directed us to any case in Nebraska or elsewhere where the common grantor rule was applied to conveyances of real estate described in accordance with the PLSS. In fact, in each of our prior decisions on the common grantor rule, the rule has been narrowly stated as given above, namely, as applying only to conveyances described by lots or lot numbers.[9] We believe this to be for good reason, and we disagree with Dzingle's assertion that the rule should apply "regardless of how the real estate is described."[10] Applying the common grantor rule to conveyances of land described by the PLSS would not only conflict with the purpose of that rule, but also undermine the PLSS.

The PLSS, also known as the rectangular survey system,[11] is a method of subdividing and describing land, mainly in the western United States.[12] This rectangular survey system has a lengthy history, having been "advocated" by Thomas Jefferson and enacted into law by the Land Ordinance of 1785.[13] And as a result of its operation, the U.S. Department

---

[8] Brief for appellant at 19.

[9] See, *Huffman, supra* note 5; *McDonald, supra* note 6; *Phillippe, supra* note 6.

[10] Brief for appellant at 22.

[11] See C. Albert White, *A History of the Rectangular Survey System* (1983).

[12] See, *McDermott Ranch v. Connolly Ranch*, 43 Cal. App. 5th 549, 256 Cal. Rptr. 3d 758 (2019); U.S. Dept. of Interior, Bureau of Land Mgmt., *Manual of Surveying Instructions* 15-17 (2009) (BLM Manual) (listing Nebraska and 29 other states created out of PLSS).

[13] See White, *supra* note 11, at 11.

of the Interior, Bureau of Land Management, maintains the instructions for public land surveys in a manual, as well as over two centuries' worth of title and cadastral survey records.[14] A cadastral survey "creates or reestablishes, marks, and defines boundaries of tracts of land" and is an official survey of the United States.[15]

The original surveys were made by

divid[ing] the land into a grid-like pattern of increasingly small squares. Starting with an initial reference line called a "meridian," the first level of the grid was formed by the intersection of "township" lines running north and south with "range" lines running east and west. The intersection of those lines formed squares that were six miles on each side, called "townships."[16]

Each township was then divided into 36 squares, 1 mile on each side, designated "'sections,'" each with an area of 640 acres, which were further subdivided into "'aliquot' parts," such as half sections and quarter sections.[17] As the surveyors worked, they "physically marked, or 'monumented,' the corners of the sections."[18]

After quarter sections or other aliquot parts are established by the PLSS, the land therein can be further subdivided by a plat map into blocks and lots.[19] A subdivision plat is a "map

---

[14] See, *id*. at 113-186; BLM Manual, *supra* note 12. See, also, Neb. Rev. Stat. § 23-1908 (Reissue 2022) ("[t]he boundaries of the public lands . . . and the division of sections into their legal subdivisions shall be in accordance with . . . the circular of instructions of the United States Department of the Interior, Bureau of Land Management").

[15] BLM Manual, *supra* note 12 at 2.

[16] *Dykes v. Arnold*, 204 Or. App. 154, 160, 129 P.3d 257, 261 (2006).

[17] *Id*. See, also, Black's Law Dictionary 1488 (12th ed. 2024) (defining "Public Land Survey System").

[18] *Dykes, supra* note 16, 204 Or. App. at 162, 129 P.3d at 263. See, also, generally, BLM Manual, *supra* note 12 (describing rectangular survey system in more detail).

[19] See BLM Manual, *supra* note 12.

describing a piece of land and its features."[20] In particular, a plat map depicts the "legal divisions of land," such as by block and lot number.[21] Notably, a plat map is "drawn after the property has been described by some other means, such as a government survey."[22] A block is a "tract of land . . . abut[ed by] roads" in a municipal plat[23] and is comprised of multiple smaller tracts of land called lots.[24] These blocks and lots are often irregular in shape, with uncertain acreage.[25] In essence, land described by lots and lot numbers is different from land described by the PLSS. Lots are smaller tracts of land carved out of the PLSS' preexisting grid. Conveyances of land described by lot numbers can be ambiguous, and lot boundaries can be changed, more so than when conveyed land is described by quarter section or otherwise by the PLSS.

Krcilek directs us to a Wisconsin case, *Chandelle Enterprises v. XLNT Dairy Farm*,[26] which reached a similar conclusion regarding the differences between land conveyed by lot number as opposed to quarter section. There, a grantor conveyed two parcels of land by deed and described the conveyed land therein by quarter sections. At the time of the conveyances, the grantor and grantees believed that an existing fence was the boundary line that separated the two parcels.[27] Later surveys determined that the fence line was located 45 to 60 feet south of the true boundary line. A suit was filed to determine the true boundary line under the doctrines of adverse possession, acquiescence, and reformation of the deeds to express

---

[20] See Black's Law Dictionary, *supra* note 17 at 1391.

[21] See *id.* at 1392.

[22] *Id.*

[23] See *id*. at 211.

[24] See *id.* at 1132.

[25] See BLM Manual, *supra* note 12.

[26] *Chandelle Enterprises v. XLNT Dairy Farm*, 282 Wis. 2d 806, 699 N.W.2d 241 (Wis. App. 2005).

[27] *Id.*

the true intentions of the buyers and sellers.[28] In the court's analysis of whether the doctrine of acquiescence and its progeny, the common grantor rule, rendered the fence the true boundary line, the court described the common grantor rule the same as we have in our prior decisions, but found the rule inapplicable because the land at issue was described in the deed not by lot number, but by quarter section.[29] The conveyance was said to thus be "'definite, certain, and unambiguous.'"[30] The court further found that extrinsic evidence showing that the parties believed the fence line was the true boundary was inadmissible because the location of the boundary at the quarter section line was described in the deed.[31] The court concluded that because the description by quarter section was not ambiguous, the doctrine of acquiescence, and implicitly, the common grantor rule, did not apply.[32]

We find *Chandelle Enterprises* to be persuasive and analogous to the case at hand. The two parcels of land at issue here were likewise described in the deeds in accordance with the PLSS, as it is undisputed that the parties were conveyed the northeast and northwest "Quarter . . . of Section 17, Township 17 North, Range 14, West of the 6th P.M." Dzingle does not challenge the validity of the analysis of *Chandelle Enterprises* insofar as it explains why the common grantor rule is inapplicable to land conveyed by quarter section. Instead, she argues that *Chandelle Enterprises* is distinguishable because Wisconsin law characterizes the common grantor rule as an exception to the doctrine of acquiescence, and Wisconsin law and Nebraska law differ in their treatment of the doctrine of acquiescence. That fact has no bearing on the conclusion we reach here.

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at 815, 699 N.W.2d at 246.

[31] *Chandelle Enterprises, supra* note 26.

[32] *Id.*

What is of significance, rather, is the fact that Wisconsin law and Nebraska law do not differ in their treatment of the common grantor rule. The common grantor rule that we apply here is the same as in the first Nebraska case to adopt the rule, and that case, in turn, adopted the rule from a decision of the Wisconsin Supreme Court.[33] The court in *Chandelle Enterprises* relied on the rationale of that same Wisconsin decision to conclude that the rule should apply to conveyances of real estate described by lot number, not by quarter section.[34]

## Mutual Recognition
### and Acquiescence

Dzingle next assigns that the district court erred in relying on the majority opinion in a Colorado case, *Salazar*, to dismiss Dzingle's mutual recognition and acquiescence claim.[35] She argues that the majority opinion in *Salazar* contradicts Nebraska law and is not as persuasive as the dissenting opinion issued in the case. We disagree on both fronts.

[6,7] Under the doctrine of mutual recognition and acquiescence, while a boundary may be fixed in accordance with a survey, when a different boundary is shown to have existed between the parties for the 10-year statutory period, it is that boundary line which is determinative and not that of the original survey.[36] We have stated that in order for mutual recognition and acquiescence to operate, there must be an assent, by words, conduct, or silence, in a line as the boundary.[37] Based on this authority, the district court did not err

---

[33] See *Huffman, supra* note 5 (citing *Phillippe, supra* note 6, which cited *Thiel v. Damrau*, 268 Wis. 76, 66 N.W.2d 747 (1954)).

[34] See *Chandelle Enterprises, supra* note 26 (citing *Thiel, supra* note 33, which cited *Herse v. Mazza*, 100 A.D. 59, 91 N.Y.S. 778 (1904)).

[35] *Salazar, supra* note 1.

[36] *Sila v. Saunders*, 274 Neb. 809, 743 N.W.2d 641 (2008). See, also, § 34-301.

[37] *Id.*

in dismissing Dzingle's doctrine of mutual recognition and acquiescence claim.

Dzingle's claim fails under the doctrine, first, because she and Krcilek did not recognize and acquiesce to the fence as the boundary for 10 consecutive years as owners of their quarter sections. They have only owned the properties since 2020. Second, Dzingle cannot rely on a grantor's acquiescence to the fence as the boundary for the required amount of time either, as the parties' mother was the previous owner and grantor of both quarter sections that were part of one larger estate before her death. The assent between two separate parties as to the boundary between their properties, rather than a singular owner, is fundamental to the operation of the doctrine and § 34-301. But here, the parties' mother could not have acquiesced to the fence as the boundary line between the two quarter sections because she owned both properties. Third, Dzingle has not presented any evidence that the two parcels had different owners at some point in time who may have acquiesced to the fence as the boundary for 10 consecutive years before the parties' mother.

Like the present case, in *Salazar*, an old fence divided two neighboring tracts of property, but the fence was not located on the government boundary line.[38] The two properties' various owners following the fence's construction acquiesced to the fence as the boundary.[39] Both properties in *Salazar* then came under common ownership for a period of 15 days, before again having different owners. A boundary dispute arose between the present owners, and one owner sought to establish the fence as the boundary under a theory of acquiescence by tacking their period of ownership onto that of the previous owners' period of ownership.[40]

---

[38] *Salazar, supra* note 1.

[39] *Id.*

[40] *Id.*

The Colorado Supreme Court rejected that argument, finding that the 15-day period of "common ownership of the two tracts of land eradicated the significance of any acquiescence as to the legal boundary existing prior to the period of common ownership as a matter of law."[41] It went on to explain that "[o]nce the two tracts fell under common ownership," the time needed for an acquiescence claim stopped ticking, and "the fence no longer served any legal purpose . . . there was no need for an internal boundary to separate the land belonging to one owner."[42]

The dissenting opinion in *Salazar* took the view that the brief period that the two properties had a common owner should not extinguish the long-acquiesced boundary at the fence line.[43] We are unpersuaded by such reasoning. In our view, the analysis of the majority opinion in *Salazar* is sound and in accordance with the Nebraska law provided above.

### Fence as Presumptive Boundary

Relatedly, Dzingle also challenges the district court's reliance on the apparent government survey marker Krcilek found on the land in accepting his proposed boundary. She argues that there was insufficient evidence to conclude that the government survey marker was anything more than a "rectangular concrete object" and that the court should have instead applied various common-law presumptions regarding old fences as boundary lines to find that the fence here was the true legal boundary.[44] We disagree and find no error in the district court's acceptance of Krcilek's proposed boundary.

---

[41] *Id.*, 911 P.2d at 1089 (relying in part on *Conklin v. Newman*, 278 Ill. 30, 115 N.E. 849 (1917), and 5 Richard R. Powell, Powell on Real Property § 62.02[10] (1994)).

[42] *Salazar, supra* note 1, 911 P.2d at 1092.

[43] *Salazar, supra* note 1 (Kourlis, J., dissenting; Vollack, C.J., and Scott, J., join).

[44] Reply brief for appellant at 7.

Krcilek testified that he and his neighbor believed the object was a government survey marker that had been there since the original government survey of the land was done. A photograph of the survey marker was received as evidence. The survey stakes from the survey commissioned by Krcilek were consistent with the marker being the quarter section boundary, not the fence as Dzingle proposed. Although Dzingle suggested to the district court that the object was not a government survey marker, we have no basis to disagree with the court's finding that it was. We consider and give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[45]

Dzingle similarly did not direct the district court or this court on appeal to any evidence supporting the fence as the true boundary. She merely argues that because the fence had been there for many years, the court should have presumed as a matter of law that the fence was the boundary. But the cases that Dzingle cites advancing those presumptions are inapplicable here.[46] The facts in each of those cases are distinguishable from the facts here in ways that are dispositive.

We stated in *Hausner v. Melia*[47] and *Clark v. Thornburg*[48] that when a boundary or corner that is assumed to have been established by a government survey is acquiesced in by

---

[45] See *Castillo, supra* note 4.

[46] See, *Singleton v. Verstrate*, No. 207201, 1999 WL 33454860 (Mich. App. Feb. 19, 1999) (citing *Corrigan v. Miller*, 96 Mich. App. 205, 292 N.W.2d 181 (1980), and *McGee v. Eriksen*, 51 Mich. App. 551, 215 N.W.2d 571 (1974)); *Hausner v. Melia*, 212 Neb. 764, 326 N.W.2d 31 (1982); *McMahon v. Morse*, 135 Misc. 233, 237 N.Y.S. 361 (1929) (quoting *Granada v. D'Allesandro*, 96 Misc. 468, 160 N.Y.S. 602 (1916)); *Wilson v. Sidle*, 17 Ohio Dec. 393 (Ohio Com. Pl. 1906); *Clark v. Thornburg*, 66 Neb. 717, 92 N.W. 1056 (1902); *Welton v. Poynter*, 96 Wis. 346, 71 N.W. 597 (1897).

[47] *Hausner, supra* note 46.

[48] *Clark,* supra note 46.

adjoining owners of such land for more than 10 years or nearly 10 years, respectively, there is a presumption that such boundary or corner is "'conclusive of the location'" of the boundary line.[49] Here, however, no party alleges that a government survey established the fence as the boundary, nor did Krcilek and Dzingle acquiesce it as such for nearly, or more than, 10 years. As we have explained above, Dzingle cannot treat the time that the parties' mother owned the land as her own for acquiescence purposes, and she and Krcilek have been owners of their adjoining quarter sections only since 2020. The cases she cites from other jurisdictions that advance a similar presumption are inapplicable for the same reason.[50]

*Singleton v. Verstrate*,[51] *Corrigan v. Miller*,[52] and *McGee v. Eriksen*[53] stand for the proposition that in the absence of an original survey marker, a long-established fence can serve to mark the boundary line. Here, however, there is evidence of the existence of an original survey marker that does mark the boundary line between the quarter sections. *Wilson v. Sidle*[54] and *Welton v. Poynter*,[55] which state that an old boundary fence is better evidence of the true boundary line than a survey made after the original survey markers have disappeared, are similarly unhelpful, as there was evidence that the original government survey markers here are still present.

---

[49] *Hausner, supra* note 46, 212 Neb. at 773, 326 N.W.2d at 37 (emphasis omitted). Accord *Clark,* supra note 46.

[50] See, *McMahon, supra* note 46; *Granada, supra* note 46 (applying presumption that fence that bounded property for approximately 20 years was true boundary line not to be disturbed even where it did not correspond with boundary line on deeds to property when property had same owners for more than 20 years).

[51] *Singleton, supra* note 46.

[52] *Corrigan, supra* note 46.

[53] *McGee, supra* note 46.

[54] *Wilson, supra* note 46.

[55] *Welton, supra* note 46.

REFORMATION OF DEEDS

Dzingle also assigns that the district court erred in not reforming her and Krcilek's deeds to reflect the fence as the boundary based on Dzingle's unilateral mistake, that alleged mistake being due to Krcilek's "fail[ure] in his duty to speak up about his belief regarding the boundary before the deeds were executed."[56] Dzingle argues that Krcilek's not disclosing his belief before she executed the deeds amounted to inequitable or fraudulent conduct by Krcilek and that had he done so, she would have conducted a survey prior to the properties' distribution and the present controversy could have been avoided.

Whether a duty to disclose or speak exists is determined by the circumstances of each case.[57] We are unpersuaded by Dzingle's argument that Krcilek owed her such a duty under the facts of this case because they were "siblings distributing their deceased mother's estate" and "doing business together."[58] The cases she offers in support of such an argument, where a duty to disclose was found, involved different types of relationships between the parties or other circumstances that are inapposite to those here.[59] Even assuming that Krcilek had such a duty, the facts here do not support a finding that his failure to disclose required the court to reform the deeds.

---

[56] Brief for appellant at 28.

[57] See *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000), *overruled on other grounds, Knights of Columbus Council 3152 v. KFS BD, Inc.*, 280 Neb. 904, 791 N.W.2d 317 (2010).

[58] Brief for appellant at 29, 30.

[59] See, *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015); *Streeks, supra* note 57; *Hanika v. Rawley*, 220 Neb. 45, 368 N.W.2d 32 (1985); *Ord v. AmFirst Invest. Servs.*, 14 Neb. App. 97, 704 N.W.2d 796 (2005), *overruled on other grounds, Knights of Columbus Council 3152, supra* note 57; *Hall v. Carter*, 324 S.W.2d 410 (Ky. App. 1959).

[8,9] Reformation may be granted to correct an erroneous instrument to express the true intent of the parties to the instrument.[60] Specifically, reformation may be ordered where there has been a unilateral mistake caused by the fraud or inequitable conduct of the other party.[61] To overcome the presumption that an agreement correctly expresses the parties' intent and therefore should be reformed, the party seeking reformation must offer clear, convincing, and satisfactory evidence.[62]

Krcilek's not disclosing his belief that the fence line was not the true boundary was not so inequitable or fraudulent to support reformation of the deeds. Despite his belief, the evidence shows that Krcilek did not address the fence line during the administration of the estate because the boundary between the quarter sections was not an issue between the siblings at that time.

In addition, all the siblings agreed, before the property was conveyed, that they would not have it surveyed to determine the true boundary lines because doing so would be inconvenient and costly. Rather, they agreed that any of them could pay for a survey to be done after the property was distributed. Dzingle could have done so at any point and discovered that the fence line was not where the true boundary lay, but she did not. The siblings also testified that they agreed they would divide the property into three approximately equal quarter sections and that it was their intent to receive those quarter sections, which is consistent with the conveyance language in the deeds. Under these facts, Dzingle failed to show sufficient evidence that the deeds did not express the parties' intent and should be reformed.

---

[60] *In re Estate of Wiggins*, 314 Neb. 565, 992 N.W.2d 429 (2023).

[61] See *id.*

[62] *R & B Farms v. Cedar Valley Acres*, 281 Neb. 706, 798 N.W.2d 121 (2011).

## COUNTERCLAIMS

As to Krcilek's counterclaims, Dzingle argues only that the district court erred in granting any of them if we agree with her that the fence is the true boundary between the quarter sections. Because we find that the court established the true boundary, there was no error in granting Krcilek's counterclaims.

## CONCLUSION

For the foregoing reasons, we find no error in the orders of the district court. We therefore affirm.

AFFIRMED.

FUNKE, J., participating on briefs.